[No. B003924. Second Dist., Div. Seven. Mar. 27, 1985.]

LA CANADA FLINTRIDGE DEVELOPMENT CORPORATION,
Plaintiff and Appellant, v.
DEPARTMENT OF TRANSPORTATION et al.,
Defendants and Respondents.

COUNSEL

Richards, Watson, Dreyfuss & Gershon, Gilbert Dreyfuss and Steven Broiles for Plaintiff and Appellant.

Robert F. Carlson, Joseph A. Montoya, Robert L. Meyer, Richard E. Ranger and Anthony L. Ruffolo for Defendants and Respondents.

OPINION

JOHNSON, J.—In this case, appellant—a developer—appeals from denial of its petition for writ of mandate against the California Department of

Transportation (the Department). This petition asked the trial court to compel the Department to grant appellant a permit to connect a new street to a state highway without requiring the developer to pay for the widening of the highway. On appeal, the developer contends the Department lacks legal power to impose the highway-widening condition because the local city council approved the intersection without any such requirement. In the alternative, the developer contends the Department is estopped from imposing this condition since it did not object during the Subdivision Map Act approval process to plans which failed to call for highway widening. We hold the Department not the local city council has ultimate power over the conditions surrounding the connection of a new street to a state highway. We further find the Department's behavior did not give rise to estoppel. Consequently, we affirm the trial court's denial of appellant's writ of mandate.

FACTS AND PROCEEDINGS BELOW

In 1977, the appellant—La Canada Flintridge Development Corporation (the developer)—began planning an 82-lot single family residential subdivision (tract 33531) in the City of La Canada-Flintridge. This proposed subdivision abutted State Highway 2, popularly known as Angeles Crest Highway. Indeed the highway formed the boundary line for most of the west and north sides of the tract. The developer planned to give lot owners access to Angeles Crest Highway by constructing a new street named Greenridge Drive and connecting it to the highway near the southwest corner of the subdivision.

Before the developer could begin building this subdivision, it was required to obtain approvals from various government agencies. Among these was the planned connection with Angeles Crest Highway. Under the terms of the Streets and Highways Code a new street cannot intersect a state highway unless a state agency, the California Department of Transportation, issues an encroachment permit. Meantime the Subdivision Map Act vests the local agency—in this case the City of La Canada-Flintridge—with responsibility for reviewing and approving the overall design of the subdivision.

In early 1978, the developer's engineering firm submitted the tentative tract map to the City of La Canada-Flintridge. The city quickly determined the proposed project required the preparation of an environmental impact report (EIR). One of the agencies contacted during the preparation of this EIR was the Department. It responded in a letter dated February 22, 1978:

"As noted in the EIR, access to the proposed tract is anticipated from Angeles Crest Highway. . . . Such access would require a permit from

Caltrans; . . . [W]e made no comment either for or against this proposed development. However, our Traffic Branch did make the following recommendations with regard to installation of a new intersection with the state highway:

"'That the highway be widened and provision for right and left-turn lanes be developed. . . . That the developer apply for the permit as soon as possible after receiving approval for the project. That this proposed intersection be made a part of the first order of work in order to accommodate construction traffic.'

". . . Please include this widening and channelization proposal or adequate alternative as a required mitigation measure in the environmental impact report. . . ."

The EIR was subsequently submitted to the city and on May 7, 1979, the city council approved the tentative map with 30 conditions the developer was expected to fulfill. Among these was condition six which required "street improvements and additional pavement widening for left turns be provided on Angeles Crest Highway at its intersection with [Greenridge Drive] to Caltrans' and City Road Department's satisfaction." Also relevant was condition 25 which directed: "A permit will be required from the State Department of Transportation for any and all work to be performed on the Angeles Crest Highway, . . . . The developer shall apply for the permit as soon as possible *after receiving approval of the project* . . . ." (Italics added.)

The developer then turned to satisfaction of the 30 conditions and preparation of the final tract map. As part of this process, the developer filed applications for two highway encroachment permits with the Department on March 19, 1980. One application requested permission to perform rough grading on Angeles Crest Highway right-of-way. The other asked to construct sewers, storm drains, local street intersections and final grading. The Department took these applications under consideration, but neither was approved during the next year.

In the meanwhile, on May 1, 1980, the developer's engineer wrote to the Department on the subject of certain state highway easements which fell within the boundaries of the tract. This letter enclosed a copy of the final map and asked if the Department had any objections to its recordation. (This final map also happened to reflect the minor changes in Angeles Crest Highway imposed by the city in condition six and no other widening of the highway, but this was not the focus of the letter.) On June 25, 1980, the

Department merely responded as requested by the developer that "the division of property in the manner set forth on the map . . . will not unreasonably interfere with the free and complete exercise of any . . . easement by the State of California, lying within the boundaries of said map."

The city issued the developer its requested grading permit in October 1980. But the Department still refused to grant either of the encroachment permits because the flood control district had not yet approved the storm drain plans. Despite this, the developer began to grade not only the subdivision but also the Angeles Crest Highway during the final months of 1980.

On March 26, 1981, and in late September of that same year discussions were held between the developer, the city and the Department to iron out differences between city and Department standards in the design of the intersection. In both instances, the discussions were based on the developer's plans which did not include any widening of Angeles Crest Highway.

On September 30, 1981, the developer recorded the final map for the subdivision. By this time the developer had actually completed the grading on Angeles Crest Highway (although it had never received an encroachment permit approving this work). On October 8, 1981, the developer mailed to the Department the final plans for improvements to Angeles Crest Highway. These plans evidently lacked some of the approval signatures the Department requires before moving ahead with processing of encroachment permits. In March 1982, a Department engineer inspected the site and for the first time raised the issue of widening the highway for a thousand feet north of the intersection. Shortly after this visit, a limited encroachment permit was issued allowing storm drain and sanitary sewer work on the highway. This permit specifically ordered submission of a permit rider dealing with highway improvements and striping.

On April 22, 1982, the Department sent a letter acknowledging receipt of striping plans but requesting detailed plans of all street improvements and related information. The developer's engineer submitted this information in August 1982. The Department found this proposal inadequate and advised the developer orally that it would require Angeles Crest Highway to be widened by twenty feet for a distance of a thousand feet north of the intersection. This was to allow vehicles entering the highway from Greenridge to integrate safely into the single lane of northbound traffic on Angeles Crest Highway.

On October 18, 1982, the developer's lawyer sent a letter objecting this additional street widening condition could not be imposed legally by the

Department. A November 16 meeting was followed by a November 26 letter from the Department insisting the highway widening would be added as a condition of the rider to the encroachment permit.

On April 4, 1983, the developer filed a petition for peremptory writ of mandate directed against the Department. This petition asked the court to compel the Department to issue an encroachment permit which does not contain a rider requiring additional highway improvements beyond those contained in the final tract map. The petition raises two contentions. (1) The additional highway widening requirement is unlawful under the Subdivision Map Act which determines what conditions can be imposed on subdivision development. (2) The Department is estopped from imposing these additional highway widening requirements because of its actions during the subdivision approval process. After a hearing, the trial court filed a statement of decision and judgment denying peremptory writ of mandate on July 26, 1983. Notice of appeal was filed on September 22, 1983, and briefing completed October 22, 1984.

### DISCUSSION

This case raises not one but a series of issues of first impression regarding the relationship between state highway management and subdivision development. However, one threshold issue largely determines the resolution of the others. That is, does the state highway department have independent authority to require the widening of a state highway as a condition of granting an encroachment permit to allow access to the highway from a new street? Or is the Department's only power to achieve that widening derived from its authority to *request* the local agency to impose such a requirement as a condition of approval of the subdivision?

If the Department's authority indeed were derived from the Subdivision Map Act then La Canada-Flintridge would have a convincing claim the Department's "request" comes too late since the final map had been approved without that condition. Moreover, the developer would have a strong case for estoppel against the government since it had relied to its detriment on the approval of the final map. We conclude, however, that the Department has the power to impose the highway widening condition as part of its own encroachment permit process and quite independent of the local subdivision development process. Consequently, the remaining issues are quite different. First, is this authority subordinated to the local agency's powers under the Subdivision Map Act when a new subdivision is being considered which contemplates creating one or more new streets accessing a state highway? If not, may the Department be estopped from imposing additional conditions

as part of granting the encroachment permit because of representations it made related to the subdivision approval process?

We also resolve these latter two issues in favor of the Department. But first let us turn to the threshold issue of the Department's power over highway encroachment permits when a local government is considering a proposed new subdivision with the multiple planning issues that sort of endeavor entails.

I. CALTRANS MAY REQUIRE AN APPLICANT TO PAY THE COST OF WIDENING A HIGHWAY AS A CONDITION OF ITS GRANT OF AN ENCROACHMENT PERMIT

Although virtually conceded by the developer in the trial court, this is not an easy issue. Moreover, in our opinion, it is the pivotal issue in this appeal. Neither party has cited any case which decides the question directly. The relevant sections of the Streets and Highways Code are not exactly clear and unambiguous on this point either. Nonetheless, we find the overall legislative scheme makes little sense unless it is construed to confer this power on the state government agency charged with responsibility for managing the state highway system.

Streets and Highways Code section 90 provides that the "department [of Transportation] shall have full . . . control of all state highways . . . ." Section 204 makes clear the "department shall exercise the same powers and duties with respect to state highways within cities as with respect to other state highways."

Among the Department's "powers and duties" over state highways is the authority to decide whether new roads and streets are to be allowed to connect with a state highway. This power is exercised through the encroachment permit process. (Sts. & Hy. Code, § 670 et seq.) Section 670 provides in pertinent part: "The department may issue written permits, . . . authorizing the permittee to do any of the following acts:

"(a) Making an opening or excavation for any purpose in any state highway." The statutory scheme makes it equally clear the Department's options are wider than an unconditional grant or outright rejection of an application to encroach. Section 672 states: "Any permit issued under . . . chapter may provide that the permittee will pay the entire expense of replacing the highway in as good condition as before, and may provide such other conditions as to the location and the manner in which the work is to be done as the department finds necessary for the protection of the highway."

The remaining question is whether section 672 empowers the Department to require "that the permittee will pay the entire expense" of widening the highway itself. This question is not resolved by the express language of the statute. On appeal, the developer contends the Department does not have this power under section 672 or any other provision of the Streets and Highways Code. Instead, according to appellant's argument, the Department can only require permittees to restore the highway to its preexisting condition at the point of the intersection with the new road. Angeles Crest Highway was a two-lane highway (one lane in each direction) before the new road entered the picture. Hence the developer argues it should not have to widen the road by some twenty feet—in essence, adding a third lane—for a thousand feet beyond the new intersection. To do this would be more than "replacing the highway in as good condition as before." It would be putting the highway in better condition than it was before the developer encroached with a new street.

Although this is a possible construction of section 672, we find it unduly restrictive on the powers of the Department to ensure "the protection of the highway" and the safety of traffic entering and using state thoroughfares. The developer's interpretation assumes the term "in as good condition as before" refers solely to the *physical* condition of the highway—its dimensions, composition, etc. It is entirely possible—and more consistent with the protection of state highways—to construe this term to mean *functional* condition not merely physical condition. Thus if access by a new street would impair the ability of a state highway to carry the preexisting traffic load as safely as before, then the Department should be able to require the developer to pay for whatever changes may be required to restore the highway to the same traffic carrying condition as existed before.

Even were we to accept the developer's narrow definition of this first clause of section 672, other language in the section supplies authority for a condition requiring the developer to pay the cost of the highway widening sought in this case. Under this language, the Department is expressly empowered to set "such other conditions as to the location and the manner in which the work is to be done as the department finds necessary for the protection of the highway." Here the Department has found traffic safety considerations require work extending to a location beyond the intersection itself—that is, to a strip some twenty feet wide and a thousand feet long. Without this work at this location, Caltrans has made a determination cars entering from the new street cannot safely integrate into the single lane of ongoing traffic on Angeles Crest Highway. Requiring the developer to perform and pay for this work appears to be a condition about "the location and manner" of this encroachment which the "department finds necessary

for the protection of the highway." As such, it is a condition the Department is empowered to impose on the developer under the authority of the Streets and Highways Code. Consequently, under either clause of section 672, we hold the Department had independent power to attach this condition to the encroachment permit it issued to the developer in this case.

II. The Department's Power to Require a Developer to Pay for Highway Widening Under the Streets and Highway Code Is Not Superseded by the Subdivision Map Act

■ We find little merit in the developer's contention the Subdivision Map Act preempts the Streets and Highways Code with respect to highway encroachments by streets which are part of new subdivisions. According to this position, local government rather than the State Department of Transportation would hold the ultimate decisionmaking power over whether a given street would be allowed to intersect with a state highway. The local body also would have the final say on what, if any, conditions could be imposed on the developer when he connected his street with the state highway. The Department would be relegated to recommending conditions which the local governing body would be free to accept or reject.

We already have quoted sections of the Streets and Highways Code which grant the Department exclusive control over all state highways (Sts. & Hy. Code, § 90) including those within cities (Sts. & Hy. Code, § 204). Another section expressly authorizes the Department to delegate all or part of its powers and duties over state highways to local government bodies. (Sts. & Hy. Code, § 676.) However, this same section expressly reserves the Department's power to revoke that delegation at any time. (*Ibid.*) In any event, we note no one claims the Department at any time delegated its encroachment permit authority to the City of La Canada-Flintridge with respect to this or any other development.

The developer relies on certain general language in the Subdivision Map Act to effectively repeal these ringing, unequivocal pronouncements in the Streets and Highways Code. Admittedly, section 66411 of the act states the "control of the design and improvement of subdivisions [is] vested in the legislative bodies of local agencies." And, section 66418 does define the term "design" to include "street alignments . . . and widths." Moreover, section 66419 indeed says the term "improvement" applies to "street work . . . on the land to be used for . . . highways . . . ."

There is nothing in the Subdivision Map Act, however, which expressly transfers power over state highways or the encroachment permit process

from state government to local governing bodies. Even if the local agency approves certain highway work and with certain conditions, this does not mean the Department is foreclosed from issuing an encroachment permit containing different and additional conditions. Indeed it is quite common that a developer must obtain permits and licenses from agencies other than and in addition to the tract map approval given by the local governing body. For example, if a proposed subdivision is near the ocean, the developer must satisfy the coastal commission as well as the local government agency. The commission can and often does impose conditions and require the developer to make expenditures beyond those the local agency insisted on during the Subdivision Map Act process. This is very analogous to the instant case. Only here the proposed subdivision abuts a state highway rather than the ocean. Consequently, it is the Department of Transportation rather than the coastal commission which is expected to assert the statewide interest in the developer's plans. But the principle is the same. The developer must obtain approvals from the state agency as well as the local government. And he must abide by conditions imposed by the state agency as well as those imposed by the local government pursuant to the Subdivision Map Act.

The developer relies heavily on a Court of Appeal decision, *Modesto Irr. Dist.* v. *City of Modesto* (1962) 210 Cal.App.2d 652 [27 Cal.Rptr. 90]. In this case, the court upheld a local ordinance which regulated the location of overhead lines along city streets despite state code provisions giving the state exclusive jurisdiction over the franchise of power lines in municipalities. However this case is easily distinguished. The state Water Code also had a specific section stating power lines could not be placed on city streets without permission from the city. This same code section allowed cities to impose reasonable conditions if they did permit power lines on their streets. (Wat. Code, § 22476.) But state highways are not power lines. Moreover, the Streets and Highways Code does not delegate any such control over state highways to local government agencies. Accordingly, *Modesto Irr. Dist.* gives no comfort to the developer's position in this case.

There are other good reasons for doubting the Legislature intended to preempt the Department's authority over access to state highways in the context of subdivision development. State highways carry many cars, buses and trucks which started their trips far away from the locality where a subdivision may be proposed. And many of them also will end their trips far from the vicinity of the proposed subdivision. The state highway system is expected to serve these long distance travelers just as much as local commuters and grocery shoppers. ■■■ To guarantee all highway users can travel safely and expeditiously requires highways to be managed by an

agency with a statewide, not a local, perspective. (*Ex Parte Daniels* (1920) 183 Cal. 636 [192 P. 442, 21 A.L.R. 1172]; *Escobedo* v. *State of California* (1950) 35 Cal.2d 870 [222 P.2d 1], overruled on other grounds *Rios* v. *Cozens* (1972) 7 Cal.3d 792 [103 Cal.Rptr. 299, 499 P.2d 979].) ■ Nowhere is this statewide perspective more crucial than when someone proposes that a new road intersect with a state highway. This new stream of entering traffic may endanger the safety or unduly impede the speed of long-distance drivers. Yet a local agency is apt to be too concerned with the convenience of local residents and the economic benefits of the proposed subdivision to impose conditions which would ensure a smooth integration of the traffic entering from the new street into the ongoing traffic on the state highway.

It would be inconsistent with the entire philosophy of state highway system managed by a state highway department to give local government the final say over the vital decision. ■ As the Supreme Court said over 30 years ago: "To hold that a state highway, . . . is 'in [the] . . . jurisdictions' of local authorities would not only create a direct conflict between the two codes, but would lead to anomalous and unreasonable results . . . . [T]he uniformity sought to be achieved by the state highway system would be defeated." (*Gillespie* v. *City of Los Angeles* (1950) 36 Cal.2d 553, 559 [225 P.2d 522].)

■ Even the Subdivision Map Act makes it clear local government can only impose design conditions related to neighborhood traffic concerns. In the very paragraph where the act indicates local agencies can require improvements on "streets and highways" this limiting language also appears: "[Such highway improvements may be required] as are *necessary for the general use of the lot owners* in the subdivision *and local neighborhood traffic* . . . ." (Gov. Code, § 66419, italics added.) Thus the Subdivision Map Act does not even purport to give jurisdiction to local government agencies to require improvements on highways related to long distance as opposed to "local neighborhood traffic." Nor does it confer this jurisdiction where the improvement is for the protection of out-of-area drivers rather than "lot owners." These powers remain where they belong—with the State Department of Transportation.

Accordingly, we hold the present statutory framework confers ultimate authority on the state highway department—not local government agencies— to determine what conditions the Department deems necessary to impose on anyone who proposes to intersect a new street with a state highway. We further hold the Subdivision Map Act does not limit this power or shift it to local government agencies.

## III. Caltrans Is Not Estopped From Imposing a Requirement the Developer Pay the Cost of Widening the Highway

The developer attempts to build a case for estoppel against the government based on the Department's behavior during the Subdivision Map Act process. ■ To establish a claim of estoppel against the government a litigant must prove the same four elements as make up a cause of action for equitable estoppel against a private party as well as a fifth element which applies only to government. The first four elements are: "(1) the party to be estopped must be apprised of the facts;

"(2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended;

"(3) the other party must be ignorant of the true state of facts; and

"(4) he must rely upon the conduct to his injury." (*Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].)

The fifth element requires the plaintiff to demonstrate that the injury to his personal interests if the government is not estopped exceeds the injury to the public interest if the government is estopped. Thus an estoppel will not be applied against the government if to do so would effectively nullify "a strong rule of policy, adopted for the benefit of the public, . . ." (*County of San Diego* v. *Cal. Water, etc., Co.* (1947) 30 Cal.2d 817, 829-830 [186 P.2d 124, 175 A.L.R. 747].)

■ The developer's case for estoppel against the government fails for a simple reason. (It might fail for other, more complicated reasons also, but we need not reach these other grounds.) The simple reason is that the encroachment permit approval process is separate and distinct from the Subdivision Map Act approval process. They are trains going down two different tracks. True, the developer had reached its final destination on the Subdivision Map Act track. Thus, the developer might well have been able to claim estoppel against the local agency should it have sought to impose additional conditions. But the developer was not at the end of the encroachment permit track at the time the Department made clear it was requiring the developer to pay for widening the highway.

To satisfy the second element of estoppel against the government—intent to induce reliance—the developer points to two instances of the Department's conduct, both closely related and both arising during the subdivision map approval process. This conduct purportedly was intended to lead the

developer to believe the Department would not require it to widen Angeles Crest highway as a condition of obtaining the encroachment permit. (Or, alternatively, this conduct was of a nature which entitled the developer to entertain a reasonable belief the Department intended it to believe the permit would be allowed without highway widening.)

The developer first cites the Department's silence in failing to mention the need for highway-widening to the city pursuant to a provision of the Subdivision Map Act—Government Code section 66436, subdivision (c)(1).[1] According to the developer if the Department had spoken up it would have allowed the City of La Canada-Flintridge to resolve whether the intersection of the proposed new street with the highway indeed was dangerous in the absence of a widening of the highway. We already have held this decision is within the province of the Department not the city. ■ But, in any event, section 66436, subdivision (c)(1) cannot be reasonably construed to impose a duty on the Department to lodge its concerns about state highways with local agencies when those highways are merely adjacent to proposed new developments.

By its own terms, this code section only relates to interests which constitute a "record title interest in the real property subdivided." Only parties which hold such interests are entitled to object and only then to the extent the proposed subdivision will interfere with the "record title interest." Here, the Department indeed owned some easements within the proposed subdivision. Under section 66436, subdivision (c)(1) it conceivably would have been entitled to inform the city it objected to the recordation of the tract map because the plan somehow harmed these easements. Arguably, its failure to bring these problems to the attention of the city would have estopped the Department from later complaining about any diminishment in

---

[1]Government Code, section 66436, subdivision (c)(1) provides in relevant part as follows: "A certificate, signed and acknowledged by all parties having any record title interest in the real property subdivided, consenting to the preparation and recordation of the final map is required, except as follows:

"(c) Signatures of parties owning the following types of interests may be omitted if their names and the nature of their respective interests are stated on the final map:

"(1) Rights-of-way, easements or other interests which cannot ripen into a fee, except those owned by a public entity, public utility, or subsidiary of a public utility for conveyance to such public utility for rights-of-way. If, however, the legislative body or advisory agency determines that division and development of the property in the manner set forth on the approved or conditionally approved tentative map will not unreasonably interfere with the free and complete exercise of the public entity or public utility right-of-way or easement, the signature of such public entity or public utility may be omitted. Where such determination is made, the subdivider shall send, by certified mail, a sketch of the proposed final map, together with a copy of this section, to any public entity or public utility which has previously acquired a right-of-way or easement."

these easements attributable to the development. But Angeles Crest Highway was not a right-of-way, easement or other record title interest in the real property subdivided. It was merely a state highway which ran adjacent to the proposed subdivision. In no way did section 66436, subdivision (c)(1) afford the Department a vehicle for voicing concerns about the subdivision's impact on Angeles Crest highway. ▮▮▮ Hence the Department's silence about this highway in the context of the section 66436, subdivision (c)(1) procedures cannot be construed as conduct intended to mislead the developer.

The other conduct cited by the developer also was related to section 66436, subdivision (c)(1). Pursuant to this section, the city had made a tentative finding that the proposed subdivision would not interfere with the free exercise of any public easements which fell within the terms of the act. As required by the same section, the developer then sent a sketch of the proposed final map to the Department and asked it to comment on the city council's finding with respect to specific easements the Department held within the boundaries of the subdivision. (Allegedly the map accompanying this letter did not reflect any significant widening of Angeles Crest Highway.) The purpose of the letter was to notify the Department of the city's finding as it related to interests which were covered by section 66436, subdivision (c)(1). Unless the Department specifically objected, its signature would not be required for recordation of the final tract map. The developer's letter did not, and could not, address Department-owned interests which were something other than "record title interests in the real property subdivided."

The developer relies on the following language in the Department's response to the above letter to evidence the Department's intent to induce reliance. "Please be advised that the division of property in the manner set forth on the map of Tract No. 33531 will not unreasonably interfere with the free and complete exercise of any previously acquired easements by the State of California, *lying within the boundaries of said map*." (Italics added.) As can be seen, the express terms of the Department's letter confine it to easements *within the boundaries* of the proposed subdivision. As observed earlier, Angeles Crest Highway was not an easement or other interest within the subdivision. Accordingly, we can find no basis for construing this as conduct reasonably calculated to induce the developer or anyone else to believe the Department had waived its right to insist the developer widen the highway when it came time to consider the encroachment permit.

Moreover, the context of this exchange of correspondence indicates both the developer and the Department were focussed solely on certain specific

easements which the Department did own and which were located within the subdivision. The Department was surrendering its right to object to the subdivision only as to those interests. Whether the plans accompanying the developer's letter indicated a widening of Angeles Crest Highway or not was simply not material to the issue which the Department was asked to address, and did address in its response.

Neither the Department's silence nor its letter responding to the developer's 66436, subdivision (c)(1) notice even remotely suggest the Department is approving or will approve the connection of the new street to the state highway without widening that highway. Instead both forms of conduct relate to an entirely different matter—the sort of interests covered by section 66436. Accordingly, we hold the developer has failed to satisfy the second element of estoppel against the government. Thus we find it unnecessary to consider whether it could meet any of the other elements.

■ Nonetheless, we do feel it worth noting the developer evidently labored under the erroneous assumption which underlies its main argument on appeal. It assumed the local agency—the La Canada City Council—controlled the highway encroachment decision. The only conditions which could be placed or expenditures required on the highway were those voted by the city council. Under this assumption, the Department's only role was to request the city to include the conditions it desired when the city approved the tentative map. So when the Department failed to ask for the widening of Angeles Crest Highway during the subdivision map approval process, it was estopped from imposing these requirements later. The developer could reasonably rely that the Department had made a final decision and desired no highway widening condition.

Reliance which is based on an erroneous interpretation of the law is not reasonable reliance. (*County of El Dorado* v. *Al Tahoe Investment Co.* (1959) 175 Cal.App.2d 407, 411-412 [346 P.2d 205].) As we have seen, the developer was in error in assuming the city council controlled the conditions surrounding the encroachment on the Angeles Crest Highway under the terms of the Subdivision Map Act when in reality this power remained in the Department pursuant to the provisions of the Streets and Highways Code. Except in extraordinary circumstances not even approached in this case, comments the Department may have made about tract maps and related plans during the subdivision approval process cannot be used as the basis of estopping this state agency from adding further conditions and imposing new requirements when it grants its own encroachment permit.

## CONCLUSION

In its brief—and with more intensity at oral argument—appellant La Canada-Flintridge complained about the plight of the unfortunate developer or contractor whose project requires connecting a street to a state highway. It must obtain two independent approvals from two different agencies of two different governments. Moreover, one of those agencies—the state highway department—will not consider an application until after the other agency— the city council or county board of supervisors—has given its final approval. Appellant indicated both in its brief and at oral argument that the members of the construction industry are vitally concerned about this issue. They are frustrated by the dual track and hoped this appeal would lead to a unified approval process with only a single decisionmaker involved.

We sympathize with this concern of the construction industry. It is never easy to deal with two masters. No doubt it is disconcerting to find new conditions and new expenditures imposed late in the development process. This is especially true when these new costs come after the developer already has sunk a great deal of money into the project. At that point it may be impossible to turn back even where the added expenses mean the project no longer "pencils out" as a profitable venture.

Nonetheless, this court has concluded the present statutory framework calls for a dual track approval process. Were we free to legislate we could at least try to come up with a solution which accommodates the construction industry's interest in expeditious review of development proposals without jeopardizing the motoring public's interest in safe and rapid movement on state highways. But we are not free to do so. In any event, for reasons spelled out earlier in this opinion, it seems unlikely reform lies in the direction argued in appellant's brief, that is, to give local government agencies ultimate power to determine how much work developers must do to safely connect new streets with state highways.

## DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied April 29, 1985, rule 27(e), California Rules of Court. Appellant's petition for review by the Supreme Court was denied July 18, 1985.